The Sam Broadhead Trust, by S. Norris Broadhead, Paul E. Broadhead, Executors-Trustees, et al. [1] v. Commissioner. Broadhead Trust v. Commissioner
Docket Nos. 844-68, 3710-69.
United States Tax Court
T.C. Memo 1972-196; 1972 Tax Ct. Memo LEXIS 62; 31 T.C.M. (CCH) 975; T.C.M. (RIA) 72196; September 7, 1972
deQuincy V. Sutton, 401 Greater Mississippi Life Bldg., Meridian, Miss., for the *64 petitioners. James D. Burroughs, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: The trial of these consolidated cases was held in Birmingham, Alabama, before Commissioner James M. Gussis of this Court. His report, which contains findings of fact, was submitted to the Chief Judge. The parties have filed some exceptions to the findings of fact. With minor variations we have adopted the findings of fact made by the trial commissioner and they are set forth below. Respondent determined the following deficiencies in estate tax, income tax and additions to tax: Docket No. 844-68
Addition to Tax
Year
Income Tax
Section 6651(a)
1965
Deficiency
I.R.C. 1954
The Sam Broadhead Trust, By: S. Norrisbroad- head, Paul E. Broadhead, Executors-Trustees
$39,211.02
$18,163.27 976 Docket No. 3710-69
Estate Tax
Deficiency
Estate of Sam E. Broadhead (Deceased), By: S. Norris Broadhead, Paul E. Broadhead, Executors
$982,745.44
The issues in Docket No. 844-68 are (1) whether respondent properly disallowed deductions in 1965 for oil operations expenses in the amount of $21,204.57; *65 (2) whether respondent properly disallowed deductions in 1965 for land management expenses and insurance costs in the total amount of $7,679.42; (3) whether the petitioner realized capital gains in 1965 in the amount of $156,844.29 in excess of the amount reported; (4) whether the petitioner (Sam Broadhead Trust) is entitled to a trust exemption of $100 under section 642(b) of the Internal Revenue Code of 1954[2] rather than the amount of $600 claimed by petitioner; and (5) whether the petitioner is liable for additions to tax in 1965 under section 6651(a). The issues in Docket No. 3710-69 are (1) the fair market value of the Sturgis lands (Arkansas) on February 6, 1965, the date of decedent's death; (2) the fair market value of the Stewart lands (Arkansas) as of the date of decedent's death; (3) the fair market value of the Pierce-Williams lands (Arkansas) as of the date of the decedent's death; (4) the fair market value of a residence and acreage (located in Lumberton, Mississippi) as of the date of decedent's death; (5) the fair market value *66 as of the date of decedent's death of two notes, plus interest, due from J. E. Stack, Jr.; (6) whether a widow's allowance of $12,000 was an allowable deduction from the gross estate in computing the taxable estate; (7) whether the capital stock of The Lamar Hotel Corporation (Meridian, Mississippi) was includable in decedent's gross estate as property owned by decedent at the time of his death; (8) whether the Estate of Sam E. Broadhead may deduct from the gross estate the amount of $300,000 as a charitable bequest under section 2055 for the purported transfer of the stock in The Lamar Hotel Corporation to the Sam Broadhead Foundation; (9) whether the Estate of Sam E. Broadhead is entitled to deductions in computing the taxable estate for Federal income tax liabilities of the decedent in the amounts of $222,249.73, $3,395.35, $285,182.16, $100,000 and $400,000 for the years 1961 through 1965, respectively; and (10) whether the Estate of Sam E. Broadhead may deduct estimated Mississippi and Louisiana income tax liabilities in the total amount of $65,000 in computing the taxable estate. Some adjustments and issues have been conceded in whole or in part and can be given effect in the *67 Rule 50 computations. Findings of Fact Some of the facts were stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. At the opening of the trial (involving Docket Nos. 844-68 and 3710-69) the parties agreed that the record in the earlier trial (involving Docket Nos. 5127-65, 1836-66, 728-68 and 1340-68) was applicable to the issues here involved. Sam E. Broadhead died testate on February 6, 1965. His two sons, S. Norris Broadhead and Paul E. Broadhead, were named in the will as executors of the estate. On August 8, 1966, the Estate of Sam E. Broadhead filed a Federal estate tax return with the district director of internal revenue, Jackson, Mississippi. The will of Sam E. Broadhead left one-hale of his property to his wife, Virdie Cox Broadhead, in trust and the remainder of his property in equal shares to his two sons and three daughters. No provision was made in the will for charitable bequests. A draft of a trust instrument entitled "Trust Indenture, The Sam Broadhead Trust, Meridian, Mississippi" was attached to the will and recommended therein as a guide. The trust instrument was later accepted without *68 change by the executors and approved by the Chancery Court of Lauderdale County, Mississippi, and placed into operation and effect to carry out the provisions of the will. S. Norris Broadhead and Paul E. Broadhead were appointed as trustees of the 977 Sam Broadhead Trust. Virdie Cox Broadhead was the beneficiary of one-half the trust and the decedent's five children were beneficiaries of equal shares in the remaining one-half. Paragraph 16 of the trust instrument provided as follows: The Trustee shall have absolute discretion as to amounts distributed and nothing herein is intended to serve as a limitation on his right to invade the corpus for distribution if, in his judgment, the same is required by the circumstances and he may fix the amounts to be paid annually in distribution but it is the express intent of this trust that, barring unforseen [sic] circumstances of extraordinary requirements, the Trustee shall distribute only the net income from normal yields from property and no more of the gains from disposition of property than may be essential in his judgment to sustain the needs and station of the beneficiaries, they having all been taught and encouraged to live *69 within their income and this instrument does not intend to change that view; this paragraph, as to needs and station in life of the beneficiaries, is not intended to assume the obligation of the Trustor to support the beneficiaries during his lifetime but is intended to apply to sums deemed to be required or desirable for them to have beyond that. Fiduciary Income Tax Return The Sam Broadhead Trust filed a Federal fiduciary income tax return (Form 1041) for the taxable year 1965 with the Southeast Service Center, Chamblee, Georgia, where it was received on November 16, 1966. The Trust had previously applied for and received an extension of time until October 15, 1966, within which to file its return. An attached letter dated November 14, 1966, advised that the return was late because State law dealing with trusts and estates required a reconciliation of accounts, which necessitated advice of counsel, and for the further reason that a court order was necessary for everything that was done. The letter indicated the principal cause of delay as resulting from litigation before the Chancery Court of Jefferson Davis County. Respondent determined in the statutory notice of deficiency *70 in Docket No. 844-68 that The Sam Broadhead Trust was liable for the additions to tax under section 6651(a) of the Code for the taxable year 1965. Sturgis Lands On March 28, 1959, Roy Sturgis sold to M. J. Eubanks of Lumberton, Mississippi, approximately 77,916.41 acres of land (hereinafter called the Sturgis lands) which Sturgis had acquired in 1951 from the State of Arkansas as forfeited tax lands. Eubanks paid Sturgis $120,000 in cash and executed his promissory note for $343,950 payable in three annual installments. Sturgis retained a vendor's lien on the land. In April 1959, Broadhead made a loan of $116,000 to Eubanks secured by a second mortgage or deed of trust on the Sturgis lands. Eubanks defaulted on the note given by him to Sturgis in the acquisition of the Sturgis lands. Thereupon Broadhead, in order to protect his interest, foreclosed his second mortgage and paid Sturgis on the first mortgage and on August 1, 1960, Sturgis by special warranty deed transferred the Sturgis lands to Broadhead. The total consideration paid by Broadhead to Sturgis was $349,596.41. The special warranty deed stated that the Sturgis lands conveyed to Broadhead included approximately 77,916.41 *71 acres. The Sturgis lands, which are located throughout 23 counties in the Ozarks in the northern part of Arkansas, consist generally of rocky and mountainous terrain, with some limestone cliffs. The growth on the lands includes scrub brush and slowgrowing timber (predominantly hardwood). Trees are scattered, attaining limited height because of the site capacity of the land. However, the lands are capable of producing a marketable crop of timber. Although the terrain is rough it is possible to log the timber on the Sturgis lands. About 204 separate tracts included in the Sturgis lands had road frontage. A majority of the Sturgis lands were situated behind acreage owned by third parties. A typical logging operation in this region on lands similar to the Sturgis lands was often conducted by a family group, with small portable mills usually brought to the logging site. As of the date of death of Sam E. Broadhead, the volume of sound timber on the Sturgis lands was approximately 15 board feet per acre. As of the date of decedent's death, the Sturgis lands consisted of 74,916 acres (after correction for the Lonoke County acreage and the duplications) located in 23 counties. The Sturgis *72 lands included approximately 987 separate tracts, with the largest tract being 640 acres and with some 15 or 20 tracts containing at least 300 acres. In May 1965, the United States Government paid $300 to the Broadheads for 222.15 978 acres of the Sturgis land (or about $1.33 per acre) which were condemned by the Government for public purposes, The Broadheads made no appearance in the United States District Court which issued the final judgment. About 266 acres of the Sturgis lands were located in Boone County in the northernmost part of Arkansas. In September 1964, about 40 acres of land in Boone County was sold for $5 per acre and in March 1966, a parcel of 160 acres was sold for $6 per acre. The United States Government owned tracts of land in some of the Sturgis lands areas during the period here involved. In 1961, 1965 and 1968, the Government offered for sale 32 tracts, 13 tracts and 18 tracts, respectively, from its holdings in this general area. Out of the 63 parcels offered for sale, 54 parcels were described as rough, mountainous and rocky terrain. In the 1965 (March) offerings of 13 tracts located in the Sturgis lands counties, seven tracts were described as rough, *73 mountainous and rocky terrain. In the sale prospectus, the Bureau of Land Management of the U.S. Department of the Interior appraised these seven as follows: Conway County
40 acres
(1/4 mi. from State Highway)
$10.00/acre
Washington County
40 acres
(State Highway through tract)
7.50/acre
Madison County
40 acres
(with creek)
7.50/acre
Faulkner County
20 acres
(with observation tower site- access by woods road)
15.00/acre
Fulton County
40 acres
(1/4 mile from road)
5.00/acre
Izard County
40 acres
(spring)
5.00/acre
Izard County
80 acres
(lies on opposing slopes)
5.00/acre
Some of the tracts offered for sale by the Government in March 1965 were not sold and they were again offered for sale in 1968. In Docket No. 1836-66 (which involves the income tax liabilities of the Broadheads for the years 1962 and 1963), the statutory notice of deficiency contains the following adjustment (and explanation) in taxable income for 1962: Gain - Arkansas timberland (Sturgis Property)
$10,611.03
Gain from the sale of 715.2 acres of land from the Sturgis, Arkan- sas, property in the above amount is detailed below:
Proceeds
Cost
Date
Acres
from Sale
6.50/A
Gain
7/31
20.0
$ 500.00
$ 130.00
8/9
655.2
13,761.33
4,258.80
4/25
40.0 998.50
260.00
$15,259.83
$4,648.80
$10,611.03
*74 Proceeds from the sale of the first two items 675.2 acres were included in Miscellaneous income reported on the return after deducting an erroneous cost of $10.00 per acre. Proceeds from the sale of the item 40 acres in the amount of $998.50 were included in Oil Lease Rent income reported. Appropriate eliminations have been made from Oil lease rent income and Miscellaneous income at item adjustments (c) and (e) of this statement. In Docket No. 1836-66, the statutory notice of deficiency contains the following adjustment (and explanation) in taxable income for 1963: Gain - Arkansas timberland (Sturgis) $740.00 Gain on the sale of 40 acres of land from the Sturgis property is computed as follows: Amended
Per Return
Sale price
$1,000.00
$1,000.00
Cost 6.50/A 260.00
300.00
$ 740.00
$ 700.00
During the year 1964 Sam E. Broadhead sold acreage from the Sturgis lands as follows: Purchaser
Acres
Selling Price
Curtis
120
$2,400.00
Broyles
160
4,006.00
Phillips
30
300.00
Eggleston
352 1/2
8,312.50
In 1967 the Estate of Sam E. Broadhead entered into a contract to sell all of the Sturgis land for $28 per acre. The sale *75 failed to materialize. From about the middle of 1968 to the date of trial, a growing demand has developed for property in the Sturgis lands. Respondent's expert witness, James B. Morrison, expressed his opinion that the fair market value of the Sturgis lands as of the date of decedent's death was $15 per acre. Some of the factors considered by Morrison in reaching this valuation were (1) the size of the acreage involved and the problems involved in selling such a large amount of land; (2) the number of tracts involved; (3) accessibility of the tracts; (4) site potential; (5) volume of timber present; (6) young growth; and (7) 979 the highest and best use of the land. Morrison also considered some 36 sales of tracts of land located in the Sturgis land counties. The 36 sales took place during the period from August 1964 to December 1965, and involved total acreage of 28,816 acres for a total consideration of $956,960.21, or about $33.21 per acre. Out of the total 36 sales, 16 of the sales took place in February 1965 and involved a total of 9,904 acres for a total consideration of $363,256.58, or about $36.67 per acre. The Arkla Chemical Corp., a division of the Arkansas-Louisiana *76 Gas Company, was then engaged in a buying program and was the grantee in 34 of the above sales transactions. Morrison inspected 13 of the tracts involved in the above transactions to make comparisons with the Sturgis lands. None of the petitioner's witnesses expressed any opinion as to the fair market value of the Sturgis lands as of the date of decedent's death. The Sturgis lands were included in Schedule A of the Federal estate tax return filed for the Estate of Sam E. Broadhead as 75,766 acres located in 24 counties with a fair market value of $1.35 per acre as of the date of decedent's death. The estate tax return erroneously included 770.40 acres (Lonoke County) in the Sturgis lands and also included duplications of about 80 acres in said lands. Respondent determined in the statutory notice of deficiency in Docket No. 3710-69 that the fair market value of the Sturgis lands as of the date of decedent's death was $15 per acre. Stewart Lands The Stewart lands are located in six counties in the northeastern part of Arkansas and include 56 separate parcels of property. The acreage of the Stewart lands is as follows: County
Acreage
Craighead
769.21
Crittenden
851.00
Lonoke
770.40
Prairie
7,433.12
White
3,912.53
Woodruff 60.00
Total
13,796.26
*77 The terrain of the Stewart lands is rolling and hilly and it contained primarily hardwood timber at the date of decedent's death, although the terrain is somewhat steeper than normally associated with the growing of hardwood timber. The top soil was shallow and of poor fertility. Approximately 3,000 acres of the Stewart lands is bottomland subject to flooding at certain seasons of the year. The remaining acreage is on higher ground, but on occasion water backs up to portions of it. In the summer of 1965 the cultivation of soybeans began to receive consideration and eventually some of the lands in the general vicinity of the Stewart lands were used to grow soybeans. Petitioner's witness, Wilkie Collins, is an agronomist and farm manager for the Morrison-Quirk Grain Corporation, a diversified corporation engaged in various agriculture operations in Nebraska (alfalfa mills, cattle), Canada (small grains used for flax) and Guatemala (cotton and rice). The corporation also owned some 20,000 acres in eastern Arkansas, farming about 5,000 acres and leasing the rest to tenant farmers under the corporation's management. Some time in 1964 Collins inspected the Stewart lands and determined *78 (1) that the soil was an acid type, (2) that the top soil was very thin, (3) water marks were evident on some of the trees, and (4) in some of the bayou areas the soil was suitable for crop production but water drainage problems made it unsuitable for farm use. Based upon these conditions, Collins considered that the Stewart lands were unsuitable for crop production for his company. On August 17, 1966, the Sam Broadhead Trust entered into contracts for the sale of Stewart lands to G. A. Robinson, Jr., Richard C. Twist and the John G. Twist Company. The contracts provided that warranty deeds would be delivered to the purchasers for 9,226.57 acres of Stewart lands over the period from January 1, 1967 to January 1, 1970. The purchase price specified in the contracts was $100.50 per acre. The sales contracts with Robinson, Twist and the John G. Twist Company were exclusive of all timber. Consequently, all of the merchantable timber on the Stewart lands was sold in 1966 to the Dacus Lumber Company. At some time subsequent to 1966, some 200 or 300 acres of the Stewart lands formerly owned by Broadhead was planted in soybeans. The fair market value of the timber on the Stewart lands *79 as of the date of decedent's death based upon actual sales of timber and allowing for intervening timber growth of 6 percent was $15.13 computed as follows: 980 Amount
Value at date
Year
received
of death
1966
$21,377.88
$ 20,095.21
1967
75,628.40
66,552.99
1968
48,871.83
40,074.90
1969
91,906.89
69,849.24
1970
696.23 487.36
$197,059.70
Fair market value of timber ($197,059.70 divided by 13,025.86 acres) $15,13/acre Respondent's expert witness, James B. Morrison, expressed his opinion that the fair market value of the Stewart land as of the date of decedent's death was approximately $85 per acre. Morrison found no comparable sales of land occurring on or about February 1965. He relied in part on three sales of comparable land in 1960, 1962 and 1967 involving transfers of 44,208 acres for a total consideration of $2,728,457.99, or about $61.95 per acre. Morrison was familiar with much of the land (in Prairie and Monroe Counties) involved in the 1960 sale of 26,773 acres for $1,608,225.90 (about $60 per acre) to Potlatch Forests, Inc. Morrison obtained his information about the date of sale, acreage conveyed and the amount of the *80 consideration from the forester employed by the buyer. The sale included an old dry kiln house and an operable sawmill and millsite. The 1962 sale involved the transfer of 12,088 (in Dallas, Grant, Saline and Cleveland Counties) to the International Paper Co., for a consideration of $852,732.09 (about $70.50 per acre). Morrison was an employee of International Paper Co., at that time and he had participated in the acquisition of this land and was familiar with the forestry aspects of the sale. The acreage was located in a swampy area and was recently cutover hardwood timberland with some of the young growth approaching merchantable timber diameter. The 1967 sale involved the transfer of 5,347 acres in Union County to the Arkansas Game and Fish Commission for a consideration of $267,500 (or about $50 per acre). The acreage is swampland without any merchantable timber. The State Commission purchased the acreage for use as a duck hunting preserve. Morrison obtained his information about the acreage involved in the 1967 sale and the consideration paid from an officer of the Commission. None of the petitioner's witnesses expressed any opinion as to the fair market value of the Stewart *81 lands as of the date of decedent's death. The Stewart lands were included in Schedule A of the Federal estate tax return filed by the Estate of Sam E. Broadhead at a fair market value as of the date of decedent's death of $30 per acre, which valuation consisted of $15 per acre for the timber and $15 per acre for the land. Respondent determined in his statutory notice of deficiency in Docket No. 3710-69 that the Stewart lands had a fair market value of $85 per acre as of the date of decedent's death. Pierce-Williams Lands In 1957 Broadhead acquired the Pierce-Williams lands (also called Bayou de View lands) located about 30 miles east of the Stewart lands in Monroe County, Arkansas. The Pierce-Williams lands consisted of approximately 3,180.24 acres contained approximately 30,000,000 board feet of timber as of the date of decedent's death. The timber was an overmature stand of predominantly tupelo gum (about 85 percent) with some cypress and some undergrowth of a younger nature. New tree growth on the land was restricted by the dense stand of existing mature trees. The water level of the Pierce-Williams lands varies considerably. The lands are somewhat swampy but have natural *82 drainage. The timber on the Pierce-Williams lands could be logged but with considerable difficulty. In overmature stands of timber, such as the stand on the Pierce-Williams lands, the quality and yield deteriorates because of a condition in the trees known as "shake," a term used to describe the separation of wood fibres. Unless care is exercised, any boards cut from this type of tree would simply fall apart. Tupelo gum that is overmature tends to become discolored, which lowers the quality of the end product. Cypress in overmature stands tends to develop a condition known as "pecky," a term used to describe dried-out worm hollows within the tree. Cypress that is only moderately "pecky" can be used to make expensive paneling. However, much of the cypress on the Pierce-Williams lands appeared to be in the advance stages of this condition which would make such cypress unmarketable. In June 1966 the Estate of Sam E. Broadhead entered into a timber cutting contract and an agreement to deed the Pierce-Williams lands to Joe L. Brown. The agreement provided for Brown to cut 3,000,000 feet of timber each year over a 981 10-year period and to pay $120,000 per year for 10 years. When *83 the amount of $1,200,000 was paid the lands involved were to be deeded to Brown. The yield from the logging operation conducted by Brown during the period 1966 to 1970 was consistently low. The Tupelo gum trees, due to "shake," could only be used to make furniture squares, a small piece of stock used in the manufacture of furniture. It was not feasible to use the trees for sawmilling boards. Brown was forced to float the logs out of the swamp. At times the water level was too low for float operations or too high for tractor operations. Brown was unable to fulfill the annual terms of the timber-cutting contract and in 1970 the contract terminated. Morrison expressed the opinion that the fair market value of the Pierce-Williams land as of the date of decedent's death was about $75 per acre. He found no comparable sales of land occurring on or about February 1965, and in making his valuation of the Pierce-Williams lands, he relied upon the same three sales in 1960, 1962 and 1967 which were used by him in making a valuation for the Stewart lands. None of the petitioner's witnesses expressed any opinion as to the fair market value of the Pierce-Williams lands as of the date of decedent's *84 death. The Pierce-Williams lands were included in Schedule A of the Federal estate tax return filed by the Estate of Sam E. Broadhead at a fair market value of $15 per acre as of the date of decedent's death. Respondent determined in the statutory notice of deficiency in Docket No. 3710-69 that the Pierce-Williams lands had a fair market value of $75 per acre as of the date of decedent's death. Lumberton Residence In 1964 Broadhead made a loan to M. J. Eubanks who gave Broadhead a deed of trust on a residence and 75 acres of land in Lumberton, Mississippi. Broadhead subsequently discovered a prior deed of trust on record which constituted a prior lien on the property. Foreclosure proceedings were instituted and Broadhead purchased the property at the foreclosure sale. Broadhead's total cost for the property, including the amount of the deed of trust held by him, was $110,000. In 1966 the property (residence and land) was sold for $65,000 by the Estate of Sam E. Broadhead. The residence and 75 acres of land in Lumberton, Mississippi, were included in Schedule A of the Federal estate tax return filed by the Estate of Sam E. Broadhead at a fair market value of $50,000 as of the *85 date of decedent's death. Respondent determined in the statutory notice of deficiency in Docket No. 3710-69 that the residence and 75 acres of land had a fair market value of $65,000 as of the date of decedent's death. J. E. Stack Notes On March 6, 1964, J. E. Stack filed a Bill of Complaint in the Chancery Court of Jefferson Davis County, Mississippi, asking for the issuance of a temporary prohibitive injunction against Sam E. Broadhead from foreclosing a deed of trust which secured Stack's note for $90,089.52 and further asking for a full and complete accounting between the parties. In June 1964, the Chancery Court ordered an accounting between Stack and Broadhead and appointed a Master in said cause. The Master rendered his report on February 20, 1969, and concluded (1) that Stack owed Broadhead a total of $181,102.76 and (2) that Broadhead owed Stack a total of $96,998.73, or a net difference in Broadhead's favor in the amount of $84,104.03. On January 27, 1970, the Chancery Court entered a final decree setting aside certain portions of the Master's report and concluding (1) that Stack owed Broadhead the amount of $156,886.98 exclusive of interest and (2) that Broadhead *86 owed Stack the sum of $96,998.73 exclusive of interest. The Chancery Court also concluded (1) that Stack owed Broadhead a total of $245,017.21 (principal and interest) and (2) that Broadhead owed Stack a total of $150,923.16 (principal and interest), or a net difference of $94,094.05 in Broadhead's favor, which amount was increased to $94,233.35 under the Court's Decree to include interest to January 30, 1970. After deductions for court costs and fees, the Estate of Sam E. Broadhead received the amount of $93,403.75. Both the Estate of Sam E. Broadhead and J. E. Stack have appealed the final decree of the Chancery Court to the Supreme Court of the State of Mississippi. In Schedule C of the Federal estate tax return filed by the Estate of Sam E. Broadhead, the two Stack notes in the original amounts of $90,089.52 and $50,000 were listed at a fair market value of $30,000 as of the date of decedent's death. Respondent determined in the statutory notice of deficiency in Docket No. 3710-69 that the 982 fair market value of the two Stack notes as of the date of decedent's death was a total of $178,912.50, which total amount represented the face amount of the notes plus interest accrued *87 to date of death. Claiwed Widow's Allowance In Schedule J of the Federal estate tax return filed by the Estate of Sam E. Broadhead, a widow's allowance of $12,000 was included among the miscellaneous expenses claimed by the estate. Respondent disallowed this item as "an unallowable deduction in arriving at the taxable amount of an estate." Claimed Deduction for Federal Income Taxes In Schedule K of the Federal estate tax return filed by the Estate of Sam E. Broadhead a deduction was claimed by the estate for Federal income tax deficiencies of the decedent in the following amounts: 1956
$ 2,191.98
1959
133,307.11
1961
222,249.73
1962
3,395.35
1963
285,182.16
1964
100,000.00
1965 400,000.00
Total
$1,146,326.33
Respondent determined in the statutory notice of deficiency that the estate was entitled to a deduction for Federal income taxes of the decedent only in the amount of $175,398.71 computed as follows: It is determined that of the total deduction claimed for Federal Income Taxes, only the following represent uncontested deficiencies which with interest to date of death are allowed as deductions: 1956 deficiency
$ 2,191.98
Interest to date of death
1,027.31
1959 deficiency
133,307.11
Interest to date of death 38,872.31
Total
$175,398.71
*88 Claimed Deduction for State Income Taxes In Schedule K of the Federal estate tax return filed by the Estate of Sam E. Broadhead,d, a deduction was claimed for estimated State income taxes of decedent in Mississippi and Louisiana in the respective amounts of $35,000 and $30,000. Respondent disallowed both items with the explanation in the statutory notice of deficiency that the "claimed deficiencies were not established liabilities at date of death." Stock of Lamar Hotel Corporation In November 1964, Sam E. Broadhead established the Sam Broadhead Foundation with his sons, Norris and Paul, as trustees. In March 1966, the foundation was granted tax-exempt status by the Internal Revenue Service as an organization described in section 501(c)(3) of the Code. On December 23, 1964, Sam E. Broadhead executed an instrument signifying his intent to transfer 68 percent of the outstanding stock in the Lamar Hotel Corporation in Meridian, Mississippi, to the Sam Broadhead Foundation. The instrument provided in part as follows: WHEREAS, I, the undersigned SAM E. BROADHEAD own and hold, or own and have the same held by others, solely for my convenience, sixty-eight per cent (68%), *89 more or less, of the total issued and outstanding capital stock of LAMAR HOTEL CORPORATION and, WHEREAS, I, the said SAM E. BROADHEAD, desire to give all said shares to SAM BROADHEAD FOUNDATION to be used in furtherance of the religious, charitable and educational plans and purposes of said Foundation; now THEREFORE, the certificates as evidence of all said shares are now and forever assigned, transferred, set over and donated by me to said Foundation, instanter, without qualification or reservation. It is a notice in this instrument, but not a condition or qualification, that some of said shares are held by Merchants and Farmers Bank of Meridian, Mississippi, as security for notes due by me, the said Sam E. Broadhead. As to those shares, I am fully able to pay the notes they secure from my current funds, but have chosen not to do so, solely as a business convenience. The trustees of SAM BROADHEAD FOUNDATION may, in their discretion, call upon me at any time to pay said notes and release said shares to such trustees. Should they do so, I will straightway pay the same, and my heirs and personal representatives are hereby bound so to do. The total current cost to me of all *90 said shares is $300,000.00, more or less. Let this be retained in my files as a copy and the original hereof be delivered to said trustees, this day and date. In the joint Federal income tax return for 1964 (which was filed after the death 983 of Sam E. Broadhead) a statement was made that the taxpayers had made a charitable contribution in 1964 in the amount of $300,000 but (inasmuch as the 1964 return showed a loss) no specific amount was actually claimed as a deduction. In Docket No. 1340-68 (1964), the respondent made the following adjustment to income in the statutory notice of deficiency: (i) It is determined that a deduction for contributions to Sam Broadhead Foundation is allowable in the amount of $80,172.67 which was not claimed on the income tax return. The amount of allowable contribution deduction is computed as following: * * * Fair market value of Lamar Hotel Corporation stock $300,000.00
Allowable deduction-20% of corrected taxable income as computed below[$400,863.37] - Section 170(b)(1)(B) of the Internal Revenue Code of 1954
80,172.67
At the date of the purported gift of the Lamar Corporation stock in 1964 to the Sam Broadhead Foundation, *91 the stock was held by the Merchants and Farmers Bank of Meridian, Mississippi, as security for certain obligations owed by Sam E. Broadhead to the former owner of the Lamar Hotel Corporation. The hotel stock was not delivered to the Sam Broadhead Foundation in 1964 nor was the stock endorsed by Sam E. Broadhead in 1964 to the foundation. After the death of Sam E. Broadhead on February 6, 1965, his estate paid the obligation for which the Lamar Hotel Corporation stock had been pledged. Thereupon the stock was delivered to Paul Broadhead who was one of the executors of the estate. Paul then delivered the stock to the Sam Broadhead Foundation. Late in 1965 an action was brought by one Harold Meyer against the Lamar Hotel Corporation in the Chancery Court of Lauderdale County, Mississippi. One of the questions before the court involved the validity of a stockholders' meeting held on October 11, 1965, which presumably turned upon the delivery or nondelivery of the hotel stock by Broadhead to the Sam Broadhead Foundation. In its opinion filed in December 1965, the Chancery Court granted the appointment of a receiver for the corporation and further stated as follows: The next question *92 that this Court feels it must decide is whether or not there was a delivery of the stock by Sam Broadhead to the Sam Broadhead Foundation. The Court feels that there was no delivery in the sense of the law, and that Mr. Broadhead never intended to transfer all his control and stock, and dominion of said stock, by his actions, and that the trustees themselves did not so consider it by their actions, which means, in this Court's opinion, that the meeting of October 11th of the corporation was a nullity. The final decree of the Chancery Court was appealed to the Supreme Court of the State of Mississippi. The parties subsequently filed a joint motion and agreement with the Supreme Court which stated in part as follows: The parties to the suit, after due consideration, have determined that the issue joined as to the foundation and its ownership of the stock of the Lamar Hotel Corporation which had been acquired by Sam Broadhead involved a collateral attack as to the ownership of the stock aforesaid; was an issue unnecessary to be determined in connection with the petition for receivership of the Lamar Hotel Corporation and that the judgment of the Chancery Court of Lauderdale County, *93 Mississippi should be reversed as to the issue of ownership of stock of the Lamar Hotel Corporation which had been acquired by Sam Broadhead. The Supreme Court accepted the joint motion and agreement of the parties and in its final decree, filed in December 1966, reversed the portion of the Chancery Court's final decree which had stated that the Lamar Hotel Corporation stock purchased by Sam E. Broadhead was his property at the time of his death and that title in the stock did not pass to the Sam Broadhead Foundation. As of November 1964, the Lamar Hotel Corporation had total assets of $301,362.25 and total liabilities of $35,666.15. On August 31, 1965, the corporation had total assets of $258,493.16 and total liabilities of $44,605.42. As of both dates, the total assets of the corporation included the value of the hotel in the amount of approximately $830,000 less reserve for depreciation ranging from about $745,000 as of November 1964 to about $766,000 as of August 31, 1965. The Lamar Hotel Corporation was subsequently placed in the hands of a court-appointed receiver and the hotel property was finally sold in 1970 for about $200,000. The Broadhead estate eventually received *94 $46,000 from the proceeds of the sale, the proceeds being in the form of five promissory notes secured by a first mortgage on the property for the sale price. 984 In Schedule G (Transfers During Decedent's Life) of the Federal estate tax return filed by the Estate of Sam E. Broadhead, the stock in the Lamar Hotel Corporation was listed at a fair market value of $300,000 as of the date of decedent's death with the following notation: This item and that appearing in Schedule N, are included in this return as a protective measure. The delivery of said shares was to Sam Broadhead Foundation in December 1964 and date of delivery has been questioned in the local court. The donation was deducted in the 1964 return of decedent. In Schedule N (Charitable, Public, and Similar Gifts and Bequests) of the Federal estate tax return filed by the Estate of Sam E. Broadhead, the shares of stock in the Lamar Hotel Corporation were listed as a deduction in the amount of $300,000. Respondent disallowed the charitable deduction in the statutory notice of deficiency in Docket No. 3710-69 with the explanation that "the claimed contribution of capital stock to the above-named foundation was not *95 made by the decedent." Claimed Deduction for Oil Operations Expenses Broadhead Drilling Co., Inc., was incorporated in December 1960, under the laws of the State of Mississippi by Sam E. Broadhead's two sons and three daughters who held all of the stock in the corporation. Norris Broadhead was president of the corporation and was concerned with the daily operational aspects of the corporation while Paul Broadhead, as secretary, was concerned with the administrative and selling aspects of the corporation. Sam E. Broadhead, although neither an officer nor a stockholder of the corporation, participated in the decisions made on behalf of the corporation and also advanced money to the corporation. At first, all checks drawn on the bank account of Broadhead Drilling Co., Inc., were signed by Norris or Paul. At a later date two signatures were required, with the signatures of Norris and Paul or the signature of Sam E. Broadhead together with the signature of Norris or Paul satisfying the requirement. Broadhead Drilling Co., Inc., maintained a bank account in its corporate name. In October 1961 the corporation employed Leontine Meacham to maintain payroll records and other corporate *96 books and records. On at least two occasions the corporation was sued in its corporate name in Mississippi State courts. The corporation obtained an employee identification number and filed Federal income tax returns. Broadhead Drilling Co., Inc., commenced drilling oil wells in January or February 1961. During 1961 the corporation drilled a total of 28 wells. In the years 1962, 1963 and 1964, the corporation drilled 30 wells, 11 wells and 1 well, respectively. Broadhead Drilling Co., Inc., ceased its operations late in 1964. In its Federal fiduciary income tax return filed for the taxable year ended December 31, 1965, the Sam Broadhead Trust claimed a deduction for oil operations expenses in the amount of $33,053.10. Respondent in the statutory notice of deficiency in Docket No. 844-68 allowed $11,848.53 of the claimed deduction and disallowed the balance of $21,204.57 made up of the following payments: Payments of loan from First National Bank on money borrowed and ad- vanced to Broadhead Drilling Co., Inc.
$ 8,899.50
Deposit to cover checks in final pay- ment of account of Broadhead Drilling Co., Inc.
150.00
Schlumberger Oil Company in settle- ment of suit of Broadhead Drilling Co., Inc.
11,768.75
State Tax Commission for unpaid con- tractors tax on Broadhead Drilling Co., Inc. 386.32
$21,204.57
*97 On Schedule K of the Federal estate tax return filed by the Estate of Sam E. Broadhead, the following items were listed as debts of the decedent and deducted by the estate: First National Bank
$ 8,899.50
Schlumberger Co. - suit for oil well drilling services and supply
11,768.75
State tax commission - oil drilling contractor tax (1964)
386.32
Claimed Land Management and Insurance Expenses In its Federal fiduciary income tax return filed for the taxable year ended December 31, 1965, the Sam Broadhead Trust claimed a deduction for land management and insurance expenses in the amount of $10,873.92. Respondent disallowed $7,679.42 of the claimed deductions on the grounds that such disallowed expenses were incurred (1) in connection with the purchase of property in North Carolina, (2) in perfecting title to lands in Arkansas, and 985 (3) in payment of personal expenses of the trustees. Capital Gains Income The Sam Broadhead Trust reported long-term capital gains of $569,686.42 on its fiduciary income tax return for 1965. Respondent determined long-term capital gains in the amount of $726,530.71, or an increase of $156,844.29, with the following explanation: *98 The resulting increase of $156,844.29 is due to changes in percentage of gain realized on installment sale, deletion of sale of Cain-Collier, and the disallowance of reduction of long term capital gain by $53,255.70 in estate tax paid. See Revenue Ruling 56-247. Trust Personal Exemption Deduction The Sam Broadhead Trust claimed a trust exemption of $600 in its fiduciary income tax return for 1965. Respondent determined that the trust was only entitled to an exemption of $100, with the explanation that "a trust which, under its governing instrument, is not required to distribute all its income currently is limited to a personal exemption of $100 as provided by section 642(b) of the Code." Opinion There are several issues presented for decision in each of these cases. In line with the findings of fact, we will first consider the issues in Docket No. 3710-69 and then those in Docket No. 844-68. 1. Fair market value of Sturgis lands at decedent's death. Valuation has been consistently recognized as an inherently imprecise process and usually, in the final analysis, it necessarily involves a "Solomonlike pronouncement." See Morris M. Messing, 48 T.C. 502, 512 (1967). *99 As this Court said in Estate of David Smith, 57 T.C. 650, 655 (1972): Difficulties encountered in determining value, e.g.,/ the presence of a limited market or other restrictive elements, have never been considered a bar to accomplishment of that task, much less to have acquired a constitutional significance, although such elements are factors to be taken into account. Certainly in an estate tax case there is an overriding necessity to determine the value of property. See Burnet v. Logan, 283 U.S. 404 (1931). And, of course, a determination of fair market value of property at the time of death is essentially a question of fact. Cf. Vardell's Estate v. Commissioner, 307 F. 2d 688, 693 (C.A. 5, 1962). Contrary to petitioner's assertion, nothing in this record permits the conclusion that respondent's action was so unjustified as to fall within the ambit of Helvering v. Taylor, 293 U.S. 507 (1935). Section 20.2031-1(b), Estate Tax Regs., provides that property includable in a decedent's gross estate is to be included at its "fair market value at the time of decedent's death." In placing a value on real property includable in *100 the estate, the standard test for determining fair market value is utilized. Fair market value is measured by what a willing buyer would pay a willing seller when neither is under any compulsion and both are reasonably informed as to all relevant facts. Willow Terrace Development Co. v. Commissioner, 345 F. 2d 933 (C.A. 5, 1965), certiorari denied 382 U.S. 938 (1965). Petitioner has the burden of proving that respondent's determination of the fair market value of the property is incorrect. First National Bank of Atlanta v. Allen, 169 F. 2d 221 (C.A. 5, 1948). We think the evidence of petitioner is insufficient to overcome respondent's determination. The testimony of the two witnesses offered by petitioner as to value of the Sturgis lands was vague and inconclusive. Neither of them testified as to the fair market value of the property. By contrast, respondent offered the expert testimony of James Morrison as to the fair market value of the property at the date of Sam Broadhead's death. He placed a value of $15 per acre on the land. Morrison was well qualified to appraise the Sturgis lands. He is a forester by training. His duties concern *101 valuation of timber and timberland. He was born in Arkansas and has lived there all of his life except for the period since 1965. He presently owns land in Arkansas and has in the past sold lands in Arkansas which he owned. He received a B.S. degree in Forestry in 1954 and in 1967 he took four courses at the University of Houston dealing with real estate appraisals. After receiving his B.S. degree, Morrison immediately began working for the International Paper Company in Arkansas as a forester. He left International Paper 986 Company in 1964 to take employment with the Internal Revenue Service. Morrision's duties with International Paper were varied and included being in charge of timber management activities, helping procure pulpwood, and acquisitions of lands where he was responsible for appraising and recommending the bid price which International Paper would use. He was involved in making appraisals for approximately thirty acquisitions in which International Paper actually made the purchase. Numerous other appraisals were made by Morrison in which International Paper was not successful in acquiring the lands because its price was too low. The appraisals made by Morrison were *102 for total value of land and timber. Since being employed by the Internal Revenue Service, Morrison has handled all appraisals in Arkansas. Approximately one-third of his time since 1965 has been in making appraisals in Arkansas. He has been involved in making appraisals of approximately 635,000 acres of land for estate and gift tax purposes. He has appraised approximately 1,8000,000 acres for other purposes. In the summer and early fall of 1967, Morrison made an appraisal of the Sturgis, Stewart and Pierce-Williams lands. In making his appraisals, he used the description of the properties attached to the Federal estate tax return when it was filed. His purpose in making the appraisals was to determine the fair market value of the lands at the date of death of Sam Broadhead. In making the appraisals he determined that the income and reconstruction approaches were not applicable and he relied on the market approach. Prior to an onsite visit of the lands, Morrison located the lands from the descriptions furnished with the estate tax return and platted their approximate locations on county maps. He then planned a route which would put him in the proximity of the largest acreage of *103 the Sturgis lands. He was already familiar with the Sturgis area from past appraisals made by him and from recreation activities in the area. Morrison also made a determination as to how many of the tracts in each county had road frontage and determined exterior boundary lines. In reaching his determination of fair market value, Morrison made an onsite inspection of 83 (after excluding three tracts visited in Lonoke County) of the 987 tracts included in the Sturgis lands. These tracts contained approximately 15,000 acres. While he set foot on tracts aggregating 15,000 acres, Morrison had ocular vision of approximately 75 to 80 percent of the Sturgis lands. In arriving at a fair market value for the Sturgis lands, Morrison relied on sales of similar and comparable properties. His value of $15 per acre was reached after assembling data for 37 sales which he knew to be similar and comparable. These sales involved a total of 40,077 acres at an average price of $43.55 per acre. Except for one sale in June 1962, the remaining comparable sales covered the period from August 1964 to December 1965. Sixteen of the comparable sales were in February 1965. Eleven of the comparable sales were *104 in January, March or April 1965. When the June 1962 sale is excluded, the remaining 36 sales involve a total of 28,816 acres which sold for an average of approximately $33.21 per acre. Morrison verified the comparable sales data relied on by him in reaching his fair market value. He also made an onsite inspection of thirteen of the comparable sales used and looked at several of the other tracts from a distance. The comparable sales inspected by him had approximately the same amount of timber as the Sturgis lands. After analyzing all his data, Morrison concluded that the Sturgis lands had a fair market value at date of death of $15 per acre. The $15 per acre figure took into account a limited market for that large amount of acreage and the fact that one would need a sales organization to sell small tracts. The value also took into account that the titles to all the lands were not secure. The fair market value determined by Morrison appears to be reasonable when the sales of some of the Sturgis lands in 1962, 1963 and 1964 are analyzed. In 1962 Sam E. Broadhead sold 715.2 acres of the Sturgis lands on the dates indicated and received consideration as indicated: Date
Acres
Average
Sold
Sold
Consideration
Per Acre
April 25
40.0
$ 998.50
$24.96
July 31
20.0
500.00
25.00
August 9
655.2
13,761.33
21.00
*105 In 1963 Broadhead sold 40 acres of the Sturgis lands for $1,000, or $25 per acre. In 1964 Broadhead sold Sturgis lands as follows for consideration as indicated: 987 Average
Purchaser
Acres
Consideration
per Acre
Curtis
120
$2,400.00
20.00
Broyles
160
4,006.00
25.04
Phillips
30
300.00
10.00
Eggiestion
352 1/2
8,312.50
23.58
With the exception of the sale of 30 acres, Broadhead received in the neighborhood of $20 to $25 per acre. We also note that the executors entered into a contract in 1967 to sell all the Sturgis lands for $28 per acre. While this deal failed to materialize and was never consummated, it is nevertheless indicative of the value the executors thought the property to be worth per acre. The $28 per acre is close to the average per acre received on the sales in 1962, 1963 and 1964. As evidence of value, petitioner introduced into evidence a prospectus for public domain land sales in Arkansas. This prospectus lists certain lands for sale with a description and the value at which the land was appraised. No evidence was introduced to show the basis for the appraisals or for what purpose they were made. There is also *106 nothing in the record to indicate what data was relied on in reaching the appraisals. There has been no showing that the appraisals were kept current or bore any fixed relation to market value. Obviously the appraisals did not represent fair market value since owners of contiguous lands could "purchase a tract by matching the high bid or paying three times the appraised price," whichever was lower within 30 days from the date of sale. Petitioner also suggests that the appraisals contained in the prospectus are comparable. Yet there has been no showing of comparability. Robert Cranston, Jr., in testifying on cross-examination, stated that he had no knowledge that any of the properties listed on the prospectus were sold or how much they may have brought at any sale. He further admitted that he had not looked at any of the lands listed in the prospectus and had no knowledge as to how the appraisals were made. In the absence of proof as to how the appraisals were made, their ratio to fair market value and showing of comparability, the appraisals listed in the prospectus are worthless for purposes of determining fair market value. Robert Cranston, Jr., and Robert Cranston, Sr., who *107 testified on behalf of petitioner, offered no opinion as to the value of the Sturgis lands. Their work is concerned with forest management of timberlands which involves a study of fertility and type of land on which timber is grown. Their studies do not involve them in the land selling business. They are not involved in land appraisals. Having carefully considered the entire record herein, we conclude, and find as an ultimate fact, that the fair market value of the Sturgis lands at the time of Sam Broadhead's death was $15 per acre. 2. Fair market value of Stewart lands at decedent's death. The evidence submitted by petitioner with respect to the Stewart lands is likewise insufficient to overcome the presumption of correctness attaching to respondent's determination. The three witnesses offered by petitioner did not offer any opinion as to the fair market value of the property. On the other hand, James Morrison testified that the property had a fair market value at date of death of $85 per acre. As previously pointed out, Morrison was well qualified to make an appraisal of the Stewart lands. He made an appraisal of the Stewart lands in the summer and early fall of 1967. He followed *108 the same procedure in valuing the Stewart lands as he followed in valuing the Sturgis lands. Morrison looked at seven separate tracts of the Stewart lands (including Lonoke County) which contained approximately 6,180 acres. In arriving at a fair market value of the Stewart lands, Morrison relied on sales of similar and comparable sales. He was unable to find any comparable sales of similar properties close to the date of death. He relied on three sales of similar and comparable properties with sale dates of June 1960, October 1962, and June 1967. These sales involved a total of 44,208 acres which sold for an average price per acre of $61.95. Morrison was familiar with the background and facts of all three of these sales. He was also aware that the executors had sold some of the Stewart lands in 1966. On August 17, 1966, the executors entered into contracts with G. A. Robinson, Jr., The John G. Twist Company and Richard C. Twist to sell 9,226.57 acres of the Stewart lands for $100.50 per acre, exclusive of timber. The agreement provided for warranty deeds to be delivered for the lands from January 1, 1967, to January 1, 1970. There is no doubt that evidence of a sale taking place *109 after a valuation date has probative force bearing on the value as of the earlier critical date, especially where 988 there has been no material change in conditions or circumstances in the interim. Estate of Fredericka Loewenstein, 17 T.C. 60 (1951). Petitioner offered the testimony of Wilkie Collins, an agronomist and farm manager for the Morrison-Quirk Grain Corporation, to attempt to prove there had been a material change of conditions for which the Stewart lands could be used. Collins looked at the Stewart lands in early fall or late summer of 1964, and took some soil samples. He felt the land was unsuitable for crop production for his company. This, however, does not mean that the land as of February 6, 1965, had no use for farm purposes. The trend toward use of land for soybean production had started prior to 1965. Soybeans were grown on lands surrounding the Stewart lands at the date of decedent's death. After Richard Twist acquired some of the Stewart lands he planted soybeans on the land. In determining a value of $85 per acre for the Stewart lands, Morrison also took into account the timber on the lands. The timber on two of the comparable sales relied *110 on by Morrison had been heavily cut prior to the date of sale and the third has been completely cleared of timber. In 1966 the Broadhead estate sold all the merchantable timber on the Stewart lands to the Dacus Lumber Co. The timber was removed because the lands were sold pursuant to contracts with G. A. Robinson, Jr., The John G. Twist Company, and Richard C. Twist. The contracts with Robinson, Twist, and The John G. Twist Company were exclusive of all timber which was on the land. The value of the timber on the Stewart lands, measured by actual sales and allowing for a 6-percent growth, at the time of death was as follows: Amount
Value at Date
Year
Received
of Death
1966
$21,377.88
$ 20,095.21
1967
75,628.40
66,552.99
1968
48,871.83
40,074.90
1969
91,906.89
69,849.24
1970
696.23 487.36 $197.059.70 The value of the timber per acre at date of death was $15.13. Thus, the Broadhead estate realized at least $115.63 per acre for the 9,226.57 acres which were sold under the contracts of sale dated August 17, 1966. Robert Cranston, Sr., Robert Cranston, Jr., and Wilkie Collins, who testified for petitioner, never offered any opinion *111 as to the fair market value of the Stewart lands. Collins testified that the lands were not suitable for use by his company as farmlands in 1964. Robert Cranston, Jr., and Robert Cranston, Sr., testified concerning the value of the timber on the land which averaged $15.13 per acre. None of these gentlemen made any appraisals of the lands and all three indicated that they were not concerned with land appraisals. Petitioner offered no evidence to establish a fair market value per acre for the land and timber at the date of death. Under the circumstances we think respondent's determination of $85 per acre for the Stewart lands was reasonable and represented its fair market value at the date of Sam Broadhead's death. We so hold. 3. Fair market value of Pierce-Williams lands at decedent's death. Here again we find the petitioner's evidence insufficient to overcome the presumption of correctness attaching to respondent's determination. The witnesses offered by petitioner stated no opinion as to the fair market value of the Pierce-Williams lands and petitioner introduced no other evidence to establish a fair market value at the date of death. On the other hand, James Morrison, respondent's *112 expert as to value of lands in Arkansas, testified that the lands had a fair market value at date of death of $75 per acre. Morrison made an appraisal of the Pierce-Williams lands in the summer and early fall of 1967. He followed the same procedure in valuing the Pierce-Williams lands as he followed in determining a value for the Sturgis and Stewart lands. In arriving at a fair market value for the Pierce-Williams lands, Morrison used the same comparable sales data used by him for the Stewart lands, which have previously been discussed. Morrison also took into account the fact that the Pierce-Williams lands contained 30,000,000 board feet of timber at decedent's death and his discussions with Joe Brown in the summer of 1964. Brown had expressed an interest in the timber on the Pierce-Williams lands. In June 1966, S. Norris Broadhead and Paul E. Broadhead, as trustees of the Estate of Sam Broadhead, entered into a timbercutting contract and agreement to deed land with Joe L. Brown. The agreement provided for Joe L. Brown to cut 3,000,000 board feet 989 of timber each year for a 10-year period and to pay $120,000 per year for each of the 10 years. When the full $1,200,000 was *113 paid, the land was to be deeded to Joe L. Brown. Some of the land was logged by Joe Brown. The contract with Brown was recently terminated. Under the terms of the contract when it was executed in June 1966, the Estate of Sam E. Broadhead would have realized $377.35 per acre. No evidence was introduced to show how much per acre was actually realized prior to terminating the contract. On this record we conclude, and find as an ultimate fact, that the fair market value of the Pierce-Williams lands on February 6, 1965, was $75 per acre. 4. Fair market value of Lumberton residence and land at decedent's death. In 1964 Sam E. Broadhead acquired a residence and 75 acres of land in Lumberton, Mississippi, as the result of a loan made to M. J. Eubanks. The executors of the estate sold the residence and the land in 1966 for $65,000. The property was reported for Federal estate tax purposes at a fair market value of $50,000. Respondent determined the fair market value to be $65,000. The respondent's determination of fair market value is presumptively correct. First National Bank of Atlanta v. Allen, supra. Petitioner introduced no evidence as to the value of the residence *114 and land. In his exceptions to Commissioner Gussis' findings, the petitioner has acknowledged that the value is $65,000 rather than $50,000 as reported. Therefore, we sustain respondent's determination. 5. Fair market value of J. E. Stack notes at decedent's death. At the date of his death the decedent owned two notes in the amounts of $90,089.52 and $50,000 which were due from J. E. Stack, Jr. These notes were secured by deeds of trust on oil or gas properties. The notes were reported for Federal estate tax purposes as having a fair market value of $30,000. Respondent included the notes in the gross estate at full face value, plus accrued interest to date of death. The total value included was $178,912.50. On March 6, 1964, J. E. Stack, Jr., filed a Bill of Complaint asking for a temporary prohibitive injunction against Sam E. Broadhead from foreclosing a deed of trust and further asking for a full and complete accounting between the parties. On June 19, 1964, an accounting was ordered by the court and a Master was appointed for such purpose. The Master rendered his report on February 20, 1969, and concluded that Stack owed Broadhead a total of $181,102.76. At the same time the *115 Master found Broadhead owed Stack a total of $96,998.73, so that there was a net difference in Broadhead's favor in the amount of $84,104.03. Section 20.2031-4, Estate Tax Regs., provides that the "fair market value of notes, secured or unsecured, is presumed to be the amount of unpaid principal, plus interest accrued to the date of death, unless the executor establishes that the value is lower or that the notes are worthless." Petitioner has failed to establish a value lower than principal, plus accrued interest to date of death. On January 27, 1970, the Chancery Court of Jefferson Davis County, Mississippi, entered a Final Decree in the litigation between Stack and Broadhead. The court set aside certain portions of the Master's report and concluded that Stack owed Broadhead, exclusive of interest, the sum of $156,886.98 and that Broadhead owed Stack the sum of $96,998.73, exclusive of interest. As of the date of the Final Decree the net amount Stack owed Broadhead, including interest, was $94,094.05. In satisfaction of the debt the estate received $94,233.35, which included interest to January 30, 1970, from funds which Stack had into court. J. E. Stack, Jr., and S. Norris Broadhead *116 and Paul E. Broadhead, co-executors of the estate, have appealed the Final Decree of the Chancery Court of Jefferson Davis County to the Supreme Court of the State of Mississippi. The litigation which has resulted from collection of the notes has not yet been resolved. The Master indicated in his report resolved. The Master indicated in his report that Stack owed Broadhead a total of $181,102.76, exclusive of interest. The Final Decree entered by the court found that Stack owed Broadhead the sum of $156,886.98. This amount has already been paid to the estate. Since the executors have appealed the Final Decree of the court, they obviously felt that Stack owed Broadhead more than the $156,886.98 determined by the court. Under the circumstances we conclude that the petitioner has failed to carry his burden of proving that the notes did not have full face value at the decedent's death. 6. Claimed deduction for widow's allowance. A widow's allowance of $12,000 was 990 deducted under miscellaneous expenses of Schedule J of the Federal estate tax return. Petitioner introduced no evidence on this question. The petition alleges that the deduction was judicially determined but it does *117 not indicate what section of the Internal Revenue Code of 1954 authorizes the deduction. The Internal Revenue Code of 1954 does not authorize a deduction for amounts "reasonably required and actually expended for the support during the settlement of the estate of those dependent upon the decedent." Such a deduction was available under section 812(b)(5) of the Internal Revenue Code of 1939, but this section was repealed by section 502(c) of the Revenue Act of 1950. The change was effective with respect to estates of decedent dying after September 23, 1950. See Estate of Mary Lois K. McIntosh, 25 T.C. 794 (1956), affirmed 248 F. 2d 181 (C.A. 2, 1957). Since no deduction is authorized by the Internal Revenue Code of 1954 for a widow's allowance, the claimed deduction was properly disallowed by respondent. [3]
7. Ownership of Lamar Hotel Corporation stock at decedent's death. It is clear that the stock of the Lamar *118 Hotel Corporation was not delivered to the Sam Broadhead Foundation in 1964. At the purported date of gift in 1964, the stock was still in the possession of the Merchants and Farmers Bank as security for a debt owed by Sam E. Broadhead. Furthermore, the stock was not endorsed by Sam Broadhead to the Foundation. After Sam Broadhead's death on February 6, 1965, the debt for which the stock was pledged was probated against the estate. The executors paid off the debt, and the stock was delivered to Paul Broadhead, who delivered it to the Foundation. The delivery was made in 1965. Paul Broadhead, one of the executors of the estate, so testified. There are two general requisites for making a gift; an intention to make a gift, and certain formalities of relinquishment of control over the property by the transferor. Robert W. Hite, Sr., 49 T.C. 580 (1968); Tyson v. Commissioner, 146 F. 2d 50, 54 (C.A. 8, 1944). Respondent does not question Broadhead's intent to make a gift. But he does contend that there was no irrevocable transfer of legal title or control of the stock so as to prevent Broadhead from exercising further dominion or control over it. There was no *119 delivery of the stock in 1964 or at any time by Sam E. Broadhead. These elements must be satisfied to constitute a gift. Robert W. Hite, Sr., supra. Section 2033 of the Code provides that "[the] value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." This includes the full value of securities pledged to secure an indebtedness of the decedent at the time of his death. Section 20.2031-2(g), Estate Tax Regs. The evidence herein does not support the allegation that there was a bona fide gift to the Sam Broadhead Foundation in 1964. The facts clearly show that there was no valid, completed gift of the stock by Broadhead prior to his death. Accordingly, we hold that the stock was properly includable in decedent's gross estate. 8. Claimed charitable contribution deduction of Lamar Hotel Corporation stock to Sam Broadhead Foundation in 1965. We must decide whether the stock of the Lamar Hotel Corporation delivered by Paul Broadhead after the death of the decedent to the Sam Broadhead Foundation entitles the estate to a charitable deduction in determining the value of the net estate. *120 The estate claimed a charitable deduction for the stock in the amount of $300,000. Sam Broadhead's intention to make a gift of the Lamar Hotel Corporation stock never resulted in any completed gift during his lifetime because there was never any effective delivery of the stock by him. The instrument executed by Sam E. Broadhead on December 1964 was nothing more than a charitable pledge or promise which was not enforceable against his estate. In addition, no provision was made by Sam Broadhead for the gift in his will. The stock was part of the decedent's estate at his death and as such legally became part of the assets of the Sam Broadhead Trust. The Sam Broadhead Foundation could receive the stock only through the acts of the trustees of the trust. No claim was filed against the estate by the Sam Broadhead Foundation. Generally, where 991 the decedent wills property to a person other than a charity, and the charity can receive the property only through the act of such legatee, devisee, trustee, or other recipient, the deduction will be defeated even though amounts are in fact paid to charities before the estate tax is determined. Norris v. Commissioner, 134 F. 2d 796 *121 (C.A. 7, 1943); Mississippi Valley Trust Co., v. Commissioner, 72 F. 2d 197 (C.A. 8, 1934). The fact that the Chancery Court of Lauderdale County, Mississippi, did not include the stock in Sam E. Broadhead's estate is not controlling. The exclusion of the stock from the gross estate was an act of the executors which was consented to by the court. William Neville, Chancellor of the Chancery Court of Lauderdale County, had jurisdiction over the affairs of the estate. He testified that although the stock had not been delivered to the Foundation by Sam E. Broadhead prior to his death he excluded the stock from the estate because he felt it had been Sam Broadhead's intent to give the stock to the Sam Broadhead Foundation. Accordingly, we sustain respondent's disallowance of the deduction. 9. Amounts deductible by the estate for Federal income taxes. The estate claimed deductions for Federal income taxes for the years and in the amounts indicated: Year
Amount
1961
$222,249.73
1962
3,395.35
1963
285,182.16
1964
100,000.00
1965
400,000.00 Respondent disallowed the amounts claimed for Federal income taxes for the taxable years 1961 to 1965, inclusive, *122 because those years are presently before this Court for decision in Docket Nos. 5127-65, 1836-66, and 1340-68. In order for Federal income taxes to be deductible, they must be enforceable. A mere proposed assessment is not deductible. Agnes McCue, 5 TCM 141 (1946). The amounts claimed as deductions for Federal income taxes on the Federal estate tax return for the taxable years 1961 through 1965 are not admitted liabilities by the estate and they have not been adjudicated by this Court. When the Federal estate tax return was filed the amounts deducted were wholly contingent and will remain so until the income tax cases have been decided by this Court. The deductible amounts can be determined later in the Rule 50 computations. 10. Claimed deductions for Mississippi and Louisiana income tax deficiencies. On the Federal estate tax return there was deducted an estimated income tax deficiency for the State of Mississippi of $35,000 and an estimated income tax deficiency for the State of Louisiana of $30,000. The amounts deducted were contingent on the States of Mississippi and Louisiana determining some income tax liability against Sam E. Broadhead. There is no evidence *123 to indicate any liability has ever been determined by these States against Sam E. Broadhead or that the estate has admitted any liability for State income taxes. In order to be able to deduct the $65,000 claimed, the tax must be enforceable by the States. A mere proposed assessment is not deductible. Accordingly, the deductions as claimed are not allowable. If income tax deficiencies are later determined and paid by petitioner, the amounts deductible can be given effect in the Rule 50 computations. 11. Claimed deduction for oil operations expenses. The Sam Broadhead Trust deducted The Sam Broadhead Trust deducted $33,053.10 as oil operations expenses on its return for 1965. Respondent disallowed payments aggregating $21,204.57 for the reason that the payments were made to satisfy indebtedness incurred by the Broadhead Drilling Company, Inc. The payments disallowed by the respondent were as follows: Payments of loan from First National Bank on money borrowed and ad- vanced to Broadhead Drilling Com- pany
$ 8,899.50
Deposit to cover checks in final pay- ment on account of Broadhead Drilling Company
150.00
Schlumberger Oil Company in settle- ment of suit of Broadhead Drilling Company
11,768.75
State Tax Commission for unpaid con- tractors tax of Broadhead Drilling Company 386.32 $21,204.57
*124 On Schedule K of the Federal estate tax return the following debts of decedent are listed and deducted by the estate: First National Bank
$ 8,889.50
Schlumberger Co., suit for oil well drilling services and supply
11,768.75
State Tax Commission: oil drilling contractor tax (1964)
386.32
No evidence was introduced as to why it was necessary for The Sam Broadhead Trust to pay the expenses of Broadhead Drilling. Sam Broadhead paid certain expenses of Broadhead Drilling prior to his 992 death, and it is assumed that these payments were regarded as debts of Sam Broadhead prior to his death. This would seem to be a correct assumption since all of the expenses (except for $150) were deducted on the Federal estate tax return. Since all of the assets of Sam Broadhead went into The Sam Broadhead Trust, it was necessary for the trust to make the payments. Both the estate and The Sam Broadhead Trust are not entitled to take deductions for the same payments. A total of $21,054.57 of the expenses deducted by The Sam Broadhead Trust was deducted on the Federal estate tax return and was not disallowed by the respondent. Thus, if the expenses were also allowed to The *125 Sam Broadhead Trust, petitioners would be obtaining a double deduction in the amount of $21,054.57 for the same payments. We cannot permit this. See Charles Ilfeld Co. v. Hernandez, 292 U.S. 62, 68-69 (1934); United States v. Skelly Oil Co., 394 U.S. 678 (1969); and section 642(g). In any event, the payments satisfied expenses incurred by Broadhead Drilling, a separate taxable entity, which ceased operations in 1964. The trust did not come into existence until approximately one year after Broadhead Drilling ceased operations. There has been no showing that the payments were "ordinary and necessary" for the trust to conduct its business operations. Payment by the trust was purely voluntary and made without consideration. Consequently, we hold that the claimed deduction was properly disallowed in part by the respondent. 12. Claimed deduction for land management and insurance expenses. Petitioner, who has the burden of proof, offered no evidence with respect to these claimed expenses. Therefore, we sustain respondent's determination disallowing them. 13. Increase in capital gains income. The Sam Broadhead Trust failed to offer any evidence on this issue. *126 Hence we uphold respondent's determination. 14. Amount of personal exemption deduction for The Sam Broadhead Trust. The Sam Broadhead Trust deducted $600 as its personal exemption. Respondent allowed a personal exemption of $100. The trust instrument establishing The Sam Broadhead Trust gives the trustees absolute discretion as to the amount of income to be distributed and to fix the amounts to be paid annually in distribution. Section 642(b) of the Code provides, in part, as follows: A trust which, under its governing instruments, is required to distribute all of its income currently shall be allowed a deduction of $300. All other trusts shall be allowed a deduction of $100. Since the governing instrument under which The Sam Broadhead Trust operates does not require it to distribute all of its income currently, the proper deduction is $100. In no event is a $600 deduction allowable. 15. Addition to tax under section 6651(a) against The Sam Broadhead Trust. The Sam Broadhead Trust filed a fiduciary income tax return (Form 1041) for the taxable year 1965 with the Southeast Service Center, Chamblee, Georgia. The return was received on November 16, 1966. An extension in which *127 to file the return was granted to October 15, 1966. The return was one month and one day late and the respondent determined a delinquency penalty of 10 percent under the provisions of section 6651(a). We must decide whether the failure to file the return on time was due to reasonable cause and not to wilful neglect. The burden of establishing reasonable cause falls on the petitioner. William M. Bebb, 36 T.C. 170 (1961); section 301.6651-1(c), Procedure and Administration Regulations. The return was forwarded for filing with the Southeast Service Center with a lengthy letter dated November 14, 1966. In summary the letter stated that the return was filed late for three reasons: (1) State law dealing with trusts and estates required reconciling of accounts and advice from an attorney, (2) a court order was necessary for everything that was done, and (3) court litigation consumed time of the executors-trustees. Although the question is close, we are satisfied that the two trustees, acting for the petitioner, exercised ordinary business care and prudence as required in order to justify a finding of reasonable cause. We therefore conclude that The Sam Broadhead Trust is *128 not liable for the addition to tax under section 6651(a) for the year 1965. To reflect concessions made by the parties and our conclusions on the disputed issues. Decisions will be entered under Rule 50. 993 Footnotes
1. The proceeding of the following petitioner is consolidated herewith: Estate of Sam E. Broadhead (Deceased), By: S. Norris Broadhead, Executors, Docket No. 3710-69.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. Petitioner does not claim that the amount of the widow's allowance qualifies for the marital deduction under section 2056. This question has not been briefed by the parties and therefore we have not considered it.↩